IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | |
|---|---|
| Eddie Stewart, ) | Case No. 7:21-cv-01782-JDA |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **OPINION AND ORDER** |
| ) | |
| GES Recycling South Carolina LLC, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This matter is before the Court on a motion for summary judgment filed by Defendant GES Recycling South Carolina, LLC ("GES").  [Doc. 46.]  In accordance with 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2), D.S.C., this matter was referred to United States Magistrate Judge Kevin F. McDonald for pre-trial proceedings.

On September 7, 2023, the Magistrate Judge issued a Report and Recommendation ("Report") recommending that the motion for summary judgment be granted in part and denied in part.  [Doc. 55.]  The Magistrate Judge advised the parties of the procedures and requirements for filing objections to the Report and the serious consequences if they failed to do so.  [*Id.* at 25.]  Both parties filed objections on September 21, 2023, and both filed replies on October 5, 2023.  [Docs. 56; 57; 59; 60.]  The motion is now ripe for review.[1]

**STANDARD OF REVIEW**

The Magistrate Judge makes only a recommendation to this Court.  The recommendation has no presumptive weight, and the responsibility to make a final

---

[1] This case was reassigned to the undersigned on February 13, 2024.  [Doc. 64.]

determination remains with the Court. *Mathews v. Weber*, 423 U.S. 261, 270–71 (1976). The Court is charged with making a de novo determination of only those portions of the Report that have been specifically objected to, and the Court may accept, reject, or modify the Report, in whole or in part. 28 U.S.C. § 636(b)(1). The Court will review the Report only for clear error in the absence of an objection. *See Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2015) (stating that "in the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation" (internal quotation marks omitted)).

## **BACKGROUND**

In ruling on a motion for summary judgment, this Court reviews the facts and reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *see also Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 433 (4th Cir. 2013). Viewed in the light most favorable to Plaintiff, the summary judgment record reveals the following facts.

Plaintiff is an African-American male and began his employment with GES in February 2017 as a driver. [Docs. 5 ¶ 4; 11 ¶ 4; 46-2 at 2, 4.] Adam Gordon is a white male and was GES's operations supervisor/operations manager and Plaintiff's supervisor. [Doc. 46-2 at 3, 7; Doc. 46-6 ¶ 1.] Not long after Plaintiff started his job with GES, Gordon told him that he should not "hang with" two particular African-American drivers because "they complain about discrimination." [Doc. 49-1 at 25; *see* 46-1 at 5.]

On June 13, 2017, Plaintiff was standing on a wall playing a game on his phone when two muscular African-American employees came up to him and gave him a fist

2

bump.  [Doc. 49-1 at 23, 49.]  Thereafter, Gordon walked up to him, "buffed up like he was a weight lifter . . . and he poked his lip out and stuck his fist out . . . and tried to give [Plaintiff] a fist bump" (the "Lip Incident").  [*Id.* at 49.]  Although Gordon did not make any racially derogatory comments during this interaction, Plaintiff felt that this was racially offensive conduct because Gordon was "trying to imitate [the] two black guys"—in particular, their "big bottom lips."  [*Id.* at 24–25.]

Later that same day, Gordon informed Plaintiff that Plaintiff's co-worker would be coming in two hours late and would "'run the two slower lines.'"[2]  [Doc. 46-2 at 68; *see id.* at 74, 91.]  Plaintiff objected and asked Gordon why it mattered which of the two employees performed the different duties, which prompted Gordon to ask whether Plaintiff had been trained to operate the crane.  [*Id.* at 68, 91.]  Plaintiff responded, "'Have you trained me to operate the crane mother[****]r?'"  [*Id.* at 68; *see id.* at 75.]  Gordon asked Plaintiff why, if he was interested in operating the crane, he never came in on his days off to operate the crane.  [*Id.* at 68, 91.]  Plaintiff answered that when he tried to do so, he ended up just doing his normal job, and he added, "'And I don't like being around all you mother[****]rs like that 'cause they childish.'"  [*Id.* at 68; *see id.* at 75, 91.]  Gordon became angry and walked out of the room.  [*Id.* at 68.]

Later that day, Gordon called Plaintiff to his office.  [*Id.* at 68–69.]  When Plaintiff arrived, Gordon told him to sit, to which Plaintiff responded, "'I don't feel like sitting down today, mother[****]r.'"  [*Id.* at 69; *see id.* at 91, 128.]  Gordon asked him what was wrong.  [*Id.* at 69, 91, 128.]  Plaintiff began to complain about not being trained on the crane and about a racially hostile environment in the workplace.  [*Id.* at 70–71, 91–92, 128.]  He told

---

[2] The record does not reflect what "run[ning] the two slower lines" entailed.

3

Gordon he was "'tired of this bulls[**]t place,'" explaining that "'you got all those people running around here and calling people "stupid n[*****]rs" and stuff, never ain't nothing been done about that.'"[3]  [*Id.* at 71, 78, 128.]  Plaintiff also told Gordon about an incident in which another employee, Justin Yarbrough, allegedly showed a picture of a long-legged chicken wearing a basketball uniform with a headline reading, "'I like to see a n[****]r catch this chicken.'"  [*Id.* at 92.]  Additionally, Plaintiff referenced an incident when Yarbrough told one of the employees to get in the front of the truck because he did not "'want to look like the "n[****]r slave driver."'"  [*Id.*]

During the same conversation, after Plaintiff made these complaints to Gordon, he also told Gordon that "it's real f[****]d up how the[y] run s[**]t," prompting Gordon to ask him if he was going to quit.  [*Id.* at 71, 82, 92.]  When Plaintiff said he was not, Gordon told him to clock out.  [*Id.* at 71, 82, 92.]  Gordon then told him he was not fired, but he was suspended for the day.  [*Id.* at 71, 82, 92.]  Plaintiff called Gordon a "fat motherf[****]r" and asked, "[H]ow you going to fire me for telling you what you asked me to tell you[?]"  [*Id.* at 92, 129.]  Gordon responded, "There is always other options."  [*Id.* at 92.]  Plaintiff, asked, "What[,] motherf[****]r?"  [*Id.*]  As Gordon walked out of the office, Plaintiff followed him outside and continued the argument, prompting another employee to come outside to tell Plaintiff to "'shut [his] mouth.'"  [*Id.* at 71–72, 92; *see id.* at 129.]  Plaintiff told her she had nothing to do with the dispute and that she should "stay the f[**]k out of it," and he continued to engage with Gordon.  [*Id.* at 92; *see id.* at 72, 129.]

---

[3] Plaintiff testified he was referring to GES employee Justin Yarbrough's comment to him that crane operator Danny Wayne Knox referred to some employees as "'stupid n[*****]rs,'" although Plaintiff had never heard Knox use the racially derogatory terms toward him personally.  [Doc. 46-2 at 10–12.]

4

At that point, Ander Garcia, who was GES's administrative manager, came out and asked him what was going on. [*Id.* at 72, 129; Doc. 46-7 ¶ 1.] Plaintiff told him that Gordon was "'playing [him] like a kid'" by calling him into the office and asking him what was wrong, then suspending him when Plaintiff answered Gordon's question. [Doc. 46-2 at 72, 129.] Garcia "talk[ed] to [Plaintiff,] calm[ed him] down," and told him he would "find out what[']s going on [by having him] come in the next day and talk . . . about it." [*Id.* at 92–93; *see id.* at 72–73, 81, 129.] Plaintiff then left. [*Id.* at 93.] He "was very, very upset." [*Id.* at 81; *see id.* at 93.]

The next day, Plaintiff came back in, spoke with Garcia and GES country manager Rodolfo Baroja, and wrote a statement about what happened. [*Id.* at 73, 83; Doc. 46-7 ¶ 2.] Plaintiff was advised to call in on June 15, 2017, his next scheduled shift, and when he did, either Garcia or Baroja advised Plaintiff that he was still suspended and would have to talk to GES's CEO. [Doc. 46-2 at 73, 83–84.] Ultimately, Baroja and Oscar Azkona, GES's human resources manager, decided to terminate Plaintiff. [Doc. 46-7 ¶ 11.] Accordingly, on June 21, 2017, Plaintiff met with Garcia and Azkona, and they advised Plaintiff that his employment was terminated. [*Id.* ¶ 12.] During the meeting, Garcia indicated that they understood Plaintiff "'had some concerns,'" but that GES could not tolerate the manner in which Plaintiff spoke to Gordon.[4] [Doc. 46-2 at 84–86.]

---

[4] GES investigated Plaintiff's allegations of racist comments by Yarbrough, and Yarbrough admitted he used the term "slave driver" on one occasion. [Doc. 46-7 ¶ 10.] Yarbrough was issued a written warning on June 22, 2017, indicating his behavior did not comply with the Employee Handbook or Code of Conduct and that any further conduct would result in more severe discipline. [Doc. 46-3.]

5

Plaintiff filed his original Complaint on June 14, 2021, and his Amended Complaint on June 15, 2021. [Docs. 1; 5.] His Amended Complaint alleges causes of action for hostile work environment, race discrimination, and retaliation for complaining of discrimination, all in violation of 42 U.S.C. § 1981. [Doc. 5 ¶¶ 13–27.] Plaintiff seeks injunctive relief, money damages, costs, and attorneys' fees. [*Id.* at 5–6.]

## DISCUSSION

**Applicable Law**

Rule 56 of the Federal Rules of Civil Procedure states, as to a party who has moved for summary judgment: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. When determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. *Id.* at 324. Rather, the non-moving party must demonstrate specific, material facts exist that give rise to a genuine issue. *Id.* Under this standard,

the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion. *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Further, Rule 56 provides in pertinent part:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). Accordingly, when Rule 56(c) has shifted the burden of proof to the non-movant, he must produce existence of a factual dispute on every element essential to his action that he bears the burden of adducing at a trial on the merits.

**The Magistrate Judge's Recommendations**

For reasons that the Court will explain, the Magistrate Judge recommends granting summary judgment to GES on the hostile work environment and race discrimination claims and denying summary judgment on the retaliation claim. [Doc. 55.] In their objections, Plaintiff objects to the Magistrate Judge's recommendation that summary judgment be granted as to the hostile work environment claim, and GES objects to the

recommendation that summary judgment be denied as to the retaliation claim.[5]  [Docs. 56; 57.]

**Plaintiff's Hostile Work Environment Claim**

Section 1981 of the Civil Rights Act of 1866 outlaws race discrimination in the making and enforcement of private contracts, *see* 42 U.S.C. § 1981(a), and it can give rise to liability for creation of a racially hostile work environment, *see Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 221 (4th Cir. 2016).  A four-year statute of limitations applies to Plaintiff's hostile work environment claim.  *Id.* at 223 ("Hostile work environment claims under § 1981 are subject to a four year limitation period.").

For a § 1981 racially hostile work environment claim, a claim comprised of some conduct outside the limitations period may be timely under the continuing violation doctrine "so long as an act contributing to that hostile environment takes place within the statutory time period."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002) (addressing a claim under Title VII of the Civil Rights Act of 1964); *see Guessous*, 828 F.3d at 224 (holding the continuing violation doctrine applies to § 1981 hostile environment claims).  When a hostile environment claim is timely under this doctrine, the Court may consider "the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period."  *Nat'l R.R. Passenger Corp.*, 536 U.S. at 105.

---

[5] Neither party has objected to the Magistrate Judge's recommendation that summary judgment be granted to GES on Plaintiff's race discrimination claim.  Having reviewed the Report, the record in this case, and the applicable law regarding the race discrimination clam, the Court finds no clear error.  Thus, the Court accepts the Report with respect to that claim and incorporates that portion of the Report by reference.  The Court will therefore focus its analysis on the Report's recommendations on Plaintiff's hostile work environment and retaliation claims.

The Magistrate Judge recommends that summary judgment be granted to GES on Plaintiff's hostile work environment claim because it is time barred.  [Doc. 55 at 12–15.] In his objections, Plaintiff challenges the conclusion that his hostile work environment claim is time barred, arguing that the continuing violation doctrine allows the Court to consider all offensive conduct Plaintiff was subjected to because the Lip Incident occurred within the limitations period and was related to the earlier conduct such that it is part of the same, continuing violation.  [Doc. 56 at 3–7.]  In its reply to Plaintiff's objections, GES contends that the Lip Incident was not based on race and, therefore, is insufficient to revive Plaintiff's untimely claims under the continuing violation doctrine.  [Doc. 59 at 1–3.]

The Court agrees with the Magistrate Judge that Plaintiff's hostile work environment claim is time barred, although the Court reaches that conclusion for a different reason.

Here, no act contributing to Plaintiff's hostile work environment occurred within the limitations period.  The Lip Incident, the last unwelcome and offensive conduct Plaintiff testified that he experienced, occurred on June 13, 2017, which is more than four years prior to Plaintiff's filing the Complaint on June 14, 2021.[6]  Plaintiff has not identified any

---

[6] The Court disagrees with the Magistrate Judge's conclusion that a reasonable jury could not find that the Lip Incident was based on Plaintiff's race. [Doc. 55 at 14–15.]  As noted, on June 13, 2017, Plaintiff was standing against a wall playing a game on his phone when two muscular African-American employees who were ending their shift walked up and fist bumped Plaintiff. [Doc. 49-1 at 23, 49.]  After the men fist bumped Plaintiff, Gordon "buffed up like he was a weightlifter . . . and he poked his [lower] lip out and stuck his fist out, . . . tr[ying] to give [Plaintiff] a fist bump." [*Id.* at 49; *see id.* at 23 (noting that Gordon "poke[d] out his bottom lip").]  Plaintiff testified that although Gordon did not "use any derogatory names during this incident," Plaintiff understood Gordon to be "trying to imitate [the] two black guys" who had just fist bumped Plaintiff by sticking his lower lip out to look like the "big bottom lips" of African Americans. [*Id.* at 24, 25.]

9

other action within the four-year period that could serve as an anchor for his hostile work environment claim. The Court therefore concludes that the hostile work environment claim is time barred, and the Court grants GES's summary judgment motion as to that claim.

**Plaintiff's Retaliation Claim**

The Magistrate Judge also recommends that summary judgment be denied as to Plaintiff's retaliation claim. The Court disagrees.

Absent direct or indirect evidence of discrimination, a plaintiff alleging retaliation under § 1981 may proceed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), to establish his claim. *Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004) ("[T]he *McDonnell Douglas* framework, developed for Title VII, has been used to evaluate race discrimination claims under [§ 1981 as well]."); *see also CBOCS W., Inc. v. Humphries,* 553 U.S. 442, 446 (2008) (holding that § 1981 encompasses retaliation claims).

---

Based on Plaintiff's description of the incident, and drawing all reasonable inferences in the light most favorable to Plaintiff, the Court concludes that a reasonable jury could find that Gordon was mockingly imitating the two African-American men who had just fist bumped Plaintiff. A jury could reasonably understand that Gordon imitated their muscular appearance by "buff[ing] up like . . . a weightlifter," that he imitated their "big bottom lips" by poking out his lower lip, and that he imitated their conduct by attempting to fist bump Plaintiff. A jury could also reasonably find that Gordon's imitating the African-American men in this way was racially offensive, especially in light of the hostility that Gordon had expressed in the past concerning African-American employees' complaints of discrimination [*id.* at 25]. *Cf. United States v. New York City Dep't of Educ.*, 407 F. Supp. 3d 365, 396 (S.D.N.Y. 2018) (denying summary judgment on race discrimination claims in part based on a principal's "racist remarks" about African-American teachers, including making fun of one teacher's "'big' lips" and remarking that that teacher's "'lips reminded her of the man in the Chiquita Banana commercial'"). Accordingly, to the extent that the Magistrate Judge concluded that a jury could not reasonably find that the Lip Incident was based on Plaintiff's race, the Court disagrees.

10

Under the burden-shifting framework, an employee must first prove a prima facie case of retaliation. *McDonnell Douglas*, 411 U.S. at 802. To do so, a plaintiff must demonstrate "(1) []he engaged in a protected activity, (2) the employer acted adversely against h[im], and (3) there was a causal connection between the protected activity and the asserted adverse action." *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011). If the plaintiff succeeds, the burden then shifts to the employer to articulate some legitimate, nonretaliatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. By providing such an explanation, the employer rebuts the presumption of retaliation created by the prima facie case, and "[t]he presumption, having fulfilled its role of forcing the [employer] to come forward with some response, simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510–11 (1993).

If the employer articulates a legitimate, nonretaliatory reason, the burden shifts back to the employee to show that the articulated reason was actually a pretext for retaliation. *McDonnell Douglas*, 411 U.S. at 804. In other words, the plaintiff must show that retaliatory animus was the real reason for the termination. *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 252 (4th Cir. 2015).

The Magistrate Judge concluded that the temporal proximity between Plaintiff's complaints to Gordon regarding racial slurs in the workplace, Plaintiff's suspension that day, and his termination several days later, was sufficient to establish a causal connection between his protected conduct and the termination for purposes of establishing a prima facie case of retaliatory termination. [Doc. 55 at 21–22.] The Magistrate Judge further concluded that GES's proffered reason for the termination—the manner in which he addressed his supervisor on June 13, 2017, including calling Gordon a "mother[****]r"

11

numerous times and referring to GES as a "bulls[**]t place"—was legitimate and nonretaliatory, and thus the burden shifted back to Plaintiff to show that the proffered reason was a pretext for retaliation. [*Id.* at 22.] The Magistrate Judge determined that Plaintiff forecasted evidence sufficient to create a genuine dispute of material fact as to pretext. [*Id.* at 23–24.] In particular, the Magistrate Judge concluded that Plaintiff's forecasted evidence that profanity was widely used by GES's workers and management undercuts GES's proffered reason for the termination and that evidence that Gordon had warned Plaintiff to stay away from two African-American employees who had raised complaints of racial discrimination tends to show that retaliatory animus was the true reason for the termination. [*Id.*]

In GES's objections to the Report, GES emphasizes that Plaintiff was terminated not simply for using profanity in the workplace, but rather, for the belligerent and insubordinate manner in which he presented his complaints to Gordon. [Doc. 57 at 4–5, 8–10.] GES argues that this belligerent and insubordinate conduct toward his supervisor "eliminates any inference [of retaliation that] simple temporal proximity [between Plaintiff's complaints and his termination] could create." [*Id.* at 4.] GES thus contends that the Magistrate Judge is incorrect in concluding that Plaintiff forecasted sufficient evidence to establish a prima facie case of retaliation or to survive summary judgment on the pretext issue. [*Id.* at 4–10.] The Court agrees with GES that it is entitled to summary judgment on the retaliation claim.

Even assuming Plaintiff can establish a prima facie case of retaliation, *see Vannoy v. Fed. Rsrv. Bank of Richmond*, 827 F.3d 296, 304 (4th Cir. 2016) (assuming, without deciding, that a plaintiff could establish a prima facie case under the *McDonnell Douglas*

12

burden-shifting framework), GES has articulated a legitimate, nonretaliatory reason for terminating Plaintiff; namely, that Plaintiff acted in a belligerent and insubordinate manner toward his supervisor.  [Doc. 46-1 at 19.]  Because GES has articulated a legitimate, nonretaliatory reason for terminating Plaintiff, the Court must consider whether Plaintiff has met his burden of demonstrating that GES's proffered reason is merely a pretext for retaliation, which would indicate whether Plaintiff could meet his ultimate burden of persuasion and demonstrate retaliation vel non.  *See Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010).  Here, Plaintiff has failed to demonstrate a genuine dispute concerning a material fact on the question of pretext.

In the Fourth Circuit, causation may be inferred "by showing that the adverse act bears sufficient temporal proximity to the protected activity, or by showing the existence of facts that suggest that the adverse action occurred because of the protected activity, or a combination of the two." *Laurent-Workman v. Wormuth*, 54 F.4th 201, 219–20 (4th Cir. 2022) (cleaned up).  Still, however, even such temporal proximity may not be sufficient to prevent summary judgment when the employee's conduct provides a legitimate basis for the adverse employment action.  *See, e.g.*, *Barrick v. Pngi Charles Town Gaming, LLC*, 799 F. App'x 188, 189–90 (4th Cir. 2020) (holding, in an action under the Bank Security Act, that a violation of the employer's "personal relationship policy" was an intervening event such that it "severed any causal connection between the reported activity and [the plaintiff's] termination"); *see also Finley v. Kraft Heinz Foods Co.*, No. 8:22-cv-426-TMC-KFM, 2023 WL 9470613, at *7–8 (D.S.C. July 13, 2023) (holding that although the plaintiff's latest protective conduct occurred in February 2020 and termination occurred around late March, summary judgment on her claim under the Food

13

Safety Management Act was appropriate when the plaintiff's conduct served as a legitimate intervening event), *Report and Recommendation adopted by* 2024 WL 340790 (D.S.C Jan. 30, 2024), *appeal filed*, No. 24-1191 (4th Cir. Mar. 4, 2024); *Norcom v. Novant Health, Inc.*, No. 3:20-cv-00673-RJC-DCK, 2022 WL 17170949, at *8 (W.D.N.C. Nov. 22, 2022) (holding that although the plaintiff was terminated less than three weeks after her protected conduct, her work infractions sufficiently undermined the inference that her termination was retaliatory and, thus, the employer was entitled to summary judgment on claim under the Fair Labor Standards Act).  Such is the case here.

The Court notes that it is undisputed that although Gordon suspended Plaintiff for one day on June 13, 2017, Plaintiff has not forecasted evidence that Gordon had any involvement in GES's response to the incident beyond the initial suspension.[7]  Indeed, Plaintiff does not dispute GES's forecasted evidence that it was Azkona and Baroja who made the decision to terminate Plaintiff.  [Doc. 46-7 ¶ 11.]  Nor is there conflicting evidence concerning the reason that Azkona and Baroja decided to terminate Plaintiff.  Plaintiff himself testified that on June 21, 2017, Garcia told him, "'We understand you had some concerns, but the way you talked to [Gordon] is something this company cannot tolerate; and therefore, we have to terminate you.'"  [Doc. 46-2 at 86.]  Garcia confirmed in his declaration that Plaintiff was terminated because GES "simply could not tolerate such belligerent and insubordinate conduct from an employee."  [Doc. 46-7 ¶ 11.]  Defendant therefore has established a legitimate, nonretaliatory basis for termination.

In the face of this forecasted evidence, and in an effort to establish pretext, Plaintiff points to evidence that profanity was commonplace at GES, including by Gordon.  [Docs.

---

[7] Plaintiff's retaliation claim is based solely on his termination.  [Doc. 5 ¶¶ 22–27.]

49 at 11; 60 at 2–3.] This focus on Plaintiff's use of profanity is a straw man, however, as GES has never claimed that Plaintiff was terminated simply for using profanity. Rather, GES claims he was terminated based on the insubordinate and belligerent conduct that he exhibited toward Gordon. [Doc. 46-7 ¶ 11.] Indeed, the outburst he directed toward Gordon was so disruptive that another employee ended up asking him to be quiet and Garcia eventually intervened to attempt to "calm[ Plaintiff] down" and then told him to go home. [Docs. 46-2 at 72, 92–93; 46-7 ¶ 9.] Plaintiff has not identified any other GES employee who ever addressed his supervisor in such an insubordinate and belligerent manner without suffering comparable consequences.

Plaintiff's only other argument that GES's proffered reason for terminating Plaintiff is unworthy of credence is that Gordon had warned Plaintiff early on in his employment to stay away from two black employees who had complained of discrimination and that Gordon had also warned another employee to stop discussing racism at GES or he would be terminated.[8] [Docs. 49 at 11; 60 at 2, 4, 8.] At most, though, this evidence tends to show that Gordon harbored retaliatory animus. As noted, however, although Gordon imposed the initial, one-day suspension on June 13, 2017, Plaintiff has not forecasted any evidence that Gordon had any involvement in any decision regarding Plaintiff after that. In fact, the day after the suspension, which was Plaintiff's day off, GES had Plaintiff come in to write a statement providing his account of the events in question. [Doc. 46-2

---

[8] GES contends that Plaintiff's forecasted "evidence" that Gordon had warned another employee that he would be terminated if he continued to discuss racism at GES was actually inadmissible hearsay. [Doc. 52 at 4.] This issue is immaterial because, as will be explained, the forecasted evidence would tend to prove Gordon's retaliatory animus and there is no basis for imputing Gordon's animus to GES concerning Plaintiff's termination.

15

at 83.]  It was then the following day—when he had been scheduled to return to work—that Garcia informed Plaintiff that his suspension would be continuing indefinitely and that Plaintiff would need to speak with GES's CEO.[9]  [*Id.* at 73, 83–85.]

Despite the temporal proximity between Plaintiff's complaints and his termination, given the belligerent and insubordinate manner in which Plaintiff presented his

---

[9] Plaintiff does not make any argument as to why any retaliatory animus on Gordon's part could be imputed to GES.  However, the Court notes that under a "cat's paw" theory of liability, *Staub v. Proctor Hosp.*, 562 U.S. 411 (2011), there are "circumstances under which an employer may be held liable . . . based on the [unlawful] animus of an employee who influenced, but did not make, the ultimate employment decision," *Smyth-Riding v. Scis. & Eng'g Servs., LLC*, 699 F. App'x 146, 155 (4th Cir. 2017).  Under such a theory, "if a supervisor performs an act motivated by [unlawful] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the . . . employment action, then the employer is liable" under Title VII.  *Staub*, 562 U.S. at 422 (footnote omitted).  To succeed under a cat's paw theory, it is not sufficient for the plaintiff to show that the subordinate had substantial influence on the termination decision; rather, he must show "sufficient evidence that the subordinate employee possessed such authority as to be viewed as the one principally responsible for the decision or the actual decisionmaker for the employer."  *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 291 (4th Cir. 2004) (en banc), *overruled in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).

In this case, Plaintiff has not forecasted evidence that Gordon intended to take any action against Plaintiff beyond suspending him for one day, that Gordon recommended any punishment beyond that initial suspension, or that Azkona and Baroja involved Gordon in any way in the decision to terminate Plaintiff.  In the absence of such evidence, a reasonable jury would have no basis for imputing any retaliatory animus from Gordon to GES concerning the termination.  *See Williams v. Piedmont Airlines, Inc.*, No. 3:21-1918-MGL-PJG, 2023 WL 4409005, at *6 (D.S.C. Mar. 31, 2023) (holding that a racist remark from the person who reported the plaintiff for an infraction that resulted in her termination was insufficient to prevent summary judgment), *Report and Recommendation adopted by* 2023 WL 3993742 (D.S.C. June 14, 2023), *aff'd*, No. 23-1743, 2023 WL 8064758 (4th Cir. Nov. 21, 2023); *Elenowitz v. FedEx Ground Package Sys., Inc.*, No. 0:21-2109-SAL-PJG, 2022 WL 19402461, at *6 (D.S.C. Sept. 23, 2022) ("[E]ven assuming Wright's and Parson's purported animus motivated their decision to report [the plaintiff's infraction, another employee's] independent investigation broke the causal link between [Wright's and Parson's] animus and [the other employee's] decision [to terminate the plaintiff]."), *Report and Recommendation adopted by* 2023 WL 2473121 (D.S.C. Mar. 13, 2023).

complaints, and given GES's subsequent investigation, no reasonable jury could conclude that GES would not have terminated Plaintiff but for the fact that Plaintiff's objectionable conduct occurred while he was complaining of race discrimination. *See Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007) (affirming the grant of summary judgment to the employer on the basis that the plaintiff failed to forecast sufficient evidence that his termination was due to his protected conduct rather than his threatening behavior); *Boyd v. Nephron Pharms. Corp.*, No. 3:20-4385-MGL-PJG, 2022 WL 2500341, at *3, 6 (D.S.C. May 19, 2022) (granting summary judgment to the employer on a retaliation claim brought under the Americans with Disabilities Act; assuming a prima facie case of retaliation was established but holding that the plaintiff failed to forecast evidence that she was not terminated for confronting a manager in a profane, threatening, and intimidating manner), *Report and Recommendation adopted in relevant part by* 2022 WL 2302199 (D.S.C. June 27, 2022); *see also Winchester v. Galveston Yacht Basin*, 119 F.3d 1, 1997 WL 367683, at *3 (5th Cir. 1997) (unpublished) ("The summary judgment evidence demonstrates" that "it was *not* the complaint itself that gave rise to [the plaintiff's] reprimand, but rather the *manner of complaint.*"). Accordingly, GES's summary judgment motion is granted as to Plaintiff's retaliation claim.

**CONCLUSION**

Based upon the foregoing, the Court accepts in part, modifies in part, and rejects in part the Report and Recommendation of the Magistrate Judge. For these reasons, GES's motion for summary judgment [Doc. 46] is GRANTED.

IT IS SO ORDERED.

s/Jacquelyn D. Austin<br>United States District Judge

May 7, 2024
Greenville, South Carolina